UNION MUTUAL LIFE INSURANCE COMPANY, Plaintiff, Appellant,

v.

CHRYSLER CORPORATION, et al., Defendants, Appellees.

UNION MUTUAL LIFE INSURANCE COMPANY, Plaintiff, Appellee,

v.

CHRYSLER CORPORATION, Defendant, Appellee,

Appeal of COMPUTER SYSTEMS OF AMERICA, INC., et al., Defendants, Appellants.

UNION MUTUAL LIFE INSURANCE COMPANY, Plaintiff, Appellee,

v.

CHRYSLER CORPORATION, Defendant, Appellant.

Nos. 85-1485, 85-1486 and 85-1504.

United States Court of Appeals, First Circuit.

Argued Dec. 5, 1985.

Decided March 25, 1986.

Margaret H. Marshall with whom Jessica Block, John A. Tisdale and Csaplar & Bok, Boston, Mass., were on brief for Union Mut. Life Ins. Co.

Douglas G. Moxham with whom Michael R. Heyison and Hale & Dorr, Boston, Mass., were on brief for Computer Systems of America.

**4**

Robert D. Cultice with whom George W. Mykulak and Goldstein & Manello, Boston, Mass., were on brief for Chrysler Corp.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

These appeals arise out of claims that the Chrysler Corporation and Computer Systems of America, Inc. ("CSA") each breached a contract. One contract, called the Lease, obliged Chrysler to pay $27,475 and later $29,291 per month for nine years as rent for some computer equipment. Union Mutual Life Insurance Company (which took Chrysler's promise as security for a loan) says Chrysler broke its promise to pay this rent.

The other contract, called the Sublease, allowed CSA to sublet the equipment from Chrysler and rent it to others, while obliging CSA to pay rent equal to what Chrysler owed under the Lease. Chrysler says that CSA breached its promise to pay the rent due under the Sublease.

Each defendant replied that it was not obliged to pay, in Chrysler's case because it had been released from its obligations, and in CSA's case because CSA had exercised its right to set aside the Sublease obligation. The court below rejected these defenses. A jury found that the Sublease bound CSA. The district court itself found (on the basis of affidavits, the Lease, and other documents) that Chrysler broke its Lease agreement, and the court entered summary judgment in favor of Union Mutual and against Chrysler.

All three parties now appeal. After reviewing the record, we conclude, with some exceptions, that the district court was correct.

I

We first set out a simplified account of the relevant background. In essence, in 1974, Chrysler decided to rent IBM computer equipment from CSA, a computer leasing company. CSA needed financing to buy the equipment. Chrysler and a CSA limited partnership (called CSA No. 332) signed a Lease, in which CSA No. 332 promised to provide the equipment and Chrysler promised to pay rent of first $27,-475 and later (after the equipment was upgraded in 1976) $29,291 each month for about nine years (from 1974 to 1983). The Lease embodied Chrysler's ironclad promise to pay the rent. It used form language designed to prevent Chrysler from asserting defenses against paying or (in colloquial 'financing' jargon) to ensure that Chrysler paid its monthly rental "come hell or high water." The parties' object in using this strong language was apparently to induce a lender to provide the $1.7 million needed to finance the IBM equipment while taking as security Chrysler's promise to pay the rent.

Union Mutual agreed to lend the money. It accepted as collateral a security interest in the computer machinery itself and an assignment of Chrysler's Lease promise. Evidently, Union Mutual (correctly) believed that a secured interest in the machinery alone would not sufficiently protect its loan, perhaps foreseeing that rapid advances in computer technology might render these machines obsolete before the loan was paid back. In Union Mutual's view, Chrysler's 'ironclad' promise, *taken together* with the machinery, offered sufficient security for the loan.

The actual transaction was more complex than just described, in part because (for reasons extraneous here) the parties brought another entity, the Shawmut Bank, into the arrangement. The Bank acted as a trustee for CSA and Union Mutual. The Bank took an assignment of the Lease and the equipment from CSA No. 332; it assigned both to Union Mutual as collateral for the $1.7 million loan; it agreed to apply the rental payments Chrysler owed under the Lease to loan repayments owed to Union Mutual. A new CSA partnership (No. 403) became the beneficial owner of the equipment. The parties agreed that Shawmut (though technically the "borrower") would play an entirely administrative role; and they executed a com-

prehensive exculpation and indemnity agreement absolving Shawmut of liability under this arrangement.

We need not dwell on the complex details of the arrangements with Shawmut, however, except to mention that in all relevant respects Chrysler knew about them. For our purposes, the essential elements of the transaction consist of CSA's promise to provide equipment, Chrysler's ironclad promise to pay rent, and the assignment of Chrysler's promise (with Chrysler's knowledge and consent) to Union Mutual as security for the $1.7 million loan.

The second contract involved in this case is a Sublease made in 1977. Chrysler by then had decided it did not want to continue renting the equipment. CSA agreed to take the equipment back. Rather than simply terminating the Lease to Chrysler, however, CSA subleased back the same equipment that it had leased; and, in return for the equipment, CSA promised to pay to Chrysler under the Sublease precisely the same $29,291 per month that Chrysler was obliged to pay under the Lease. This apparently self-cancelling transaction makes sense once one remembers that Chrysler's promise to pay rent under the Lease then ran not to CSA, but to Union Mutual, which had taken an assignment of the promise as security. CSA began to send the $29,291 to Shawmut each month; and Shawmut dutifully sent the money on to Union Mutual as repayments (principal and interest) of the loan.

Although CSA for a time complied with its Sublease obligations, in fact CSA and Chrysler had a serious dispute about the validity of the Sublease. During the course of negotiations over the Sublease in early 1977, Chrysler officials began to dither about whether they really wanted to keep, or to give up, the equipment. The parties signed the Sublease, but CSA officials gave Chrysler an option to back out. They also insisted on having the same option themselves. This withdrawal option was embodied in a written "side letter" agreement.

The side letter says that the options expire on March 1, 1977. But CSA argues that Chrysler officials extended CSA's "back-out" option until sometime after March 27. This last date is important, because on that day IBM announced lower prices for its computer equipment—and Chrysler's rented equipment consequently fell in value. In any event, CSA backed out (or tried to back out) of the Sublease near or just after March 27. In Chrysler's view CSA was too late; in CSA's view its renunciation of the Sublease was timely in light of recent conversations with Chrysler officials.

Despite the dispute, CSA took back the equipment (though saying at the time that it did not consider itself bound by the Sublease). CSA sub-subleased the equipment at a profit, and sent $29,291 to Shawmut each month for four years. Then, in 1981, when the Lease (and Sublease) still had two more years to run, CSA stopped paying. Union Mutual demanded payment first from CSA, then from Chrysler. When both refused to pay, Union Mutual sued both of them. Chrysler in turn crossclaimed against CSA.

As we have previously mentioned the district court decided that Chrysler had no valid defense to Union Mutual's suit for payment under the Lease. It held that the affidavits and other papers showed the absence of any "genuine issue as to any material fact." Fed.R.Civ.P. 56. The jury then decided that CSA was bound by the Sublease. In addition, the court found that because of the Sublease, CSA and its president, Frank Keohane, must indemnify Chrysler for the payments it must make to Union Mutual. Union Mutual settled its direct claim against CSA.

We turn now to the issues the parties raise on this appeal.

## II

### The CSA Defendants

The CSA defendants include CSA and CSA President Frank Keohane. The jury found that CSA was bound by its Sublease

promises. The district judge, after making any necessary additional factual determinations (*see* Fed.R.Civ.P. 49), held that CSA was liable for breach of the Sublease and must indemnify Chrysler insofar as Chrysler was liable to Union Mutual. He also held that Frank Keohane was personally liable to indemnify Chrysler. These defendants attack each of these determinations.

## A. *The Breach of Contract*

1. CSA argues that the district court should have granted it a new trial in respect to the jury's key findings about the Sublease, namely that CSA tried to back out of the Sublease too late; its option to do so had expired. The jury made these findings in response to two special questions:

> Question 1. Did Chrysler (through [its employee] Harris, acting within the scope of his actual or apparent authority) and CSA make an oral contract modifying their earlier written contract (the sublease and side letter of January 21, 1977) to provide that the time within which either party could cancel the sublease was extended for a period that included March 27, 1977?
>
> Answer YES or NO. <u>NO</u>
>
> Question 4. Did Chrysler (through Harris, acting within the scope of his employment) make a representation or representations to CSA that Chrysler would treat the sublease as no longer binding if IBM made its price announcement before Chrysler gave CSA notice as to whether or not Chrysler wished to cancel the sublease?
>
> Answer YES OR NO. <u>NO</u>

■ In order to obtain a new trial, CSA must show that these findings are "so clearly against the weight of the evidence that they produce a manifest miscarriage of justice." *Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 200 (1st Cir.1980); *see also Valm v. Hercules Fish Products, Inc.*, 701 F.2d 235, 237 (1st Cir.1983). We can find no such "manifest miscarriage of justice" here.

■ As we read the record the critical factual questions concerned conversations between Chrysler and CSA officials at the end of February. CSA and Chrysler had signed the "side letter" agreement giving both of them until March 1, 1977 to back out of the Sublease. On February 25 (just before the side letter options were to expire), CSA's President, Frank Keohane, and CSA's Vice-President of Marketing, Daniel Roggeman, called Lee Harris at Chrysler and asked whether Chrysler would exercise its option to withdraw. Harris said that Chrysler was still unsure.

What followed is hotly disputed. Harris testified that the conversation was limited to CSA telling him he could take a few extra days to decide. The CSA people say that Harris agreed to extend the side letter agreement until Chrysler notified CSA of its decision. They add that they warned Harris that IBM might soon announce lower prices for its computers thereby lowering the value of the Chrysler equipment; Harris (says CSA) then agreed that Chrysler would release CSA from the Sublease if IBM made any such announcement before Chrysler made up its mind. On March 27, before either party repudiated the Sublease, IBM made its pricing announcement and Chrysler's rental equipment fell in value. Both Chrysler and CSA agree that CSA then backed out (or tried to back out) of the Sublease.

The jury, however, in reaching its factual conclusions (reported in its answers to Questions 1 and 4), might have believed the following testimony of Chrysler's employee Harris, in respect to the critical conversation that he had with Keohane and Roggeman on February 25, 1977:

> Q. Mr. Harris, what did Mr. Keohane say to you during that conversation and what did you say to him, please?
>
> A. Well, we—as most people do, you kind of open up with how's the weather and introduce yourself and so forth and so on. But the gist of the thing was the Frank asked me how the—if I had heard from Bud Bolin [the Chrysler Financial

official considering whether to make use of the equipment], and I indicated that I hadn't. And then Frank asked if the deal was coming into place at Chrysler, and I said that I had heard nothing of the deal at that point.

Q. What did Mr. Keohane say to you?

A. At that point he said, "I suggest that we go ahead and take a couple of extra days if you need them." And he said, "What we'll do is, we have the quote out to Bolin, and either myself or Roggeman will follow up with Bolin to see if he can put the deal together." And when he said this, I indicated that I didn't have a problem with a few extra days' extension.

Q. Did you have an understanding what he meant by 'a few extra days' during that conversation?

A. Well I was of the opinion it would be a short—short period of time.

Q. Did he say a "few extra days" to you?

A. Yes he did.

Q. What else was said during that conversation, Mr. Harris?

A. That was pretty much the upshot of the conversation.

Q. Nothing else was said?

A. No, it wasn't.

If the jury believed this account, rather than that of Keohane and Roggeman, it could have reasonably concluded that any extension of the time to call off the Sublease ended before March 27. It might have also believed, given Harris's testimony of silence on the subject, that Chrysler did not agree that an IBM price announcement (prior to a definite notification by Chrysler of its decision about what to do with the equipment) would cancel the Sublease.

The best CSA can do by way of uncontroverted evidence is to point to 1) a March 23, 1977, memorandum written by CSA's Daniel Roggeman which recounts a conversation between Roggeman and Harris on March 22 in which Harris asked to meet with CSA about the equipment and 2) Harris's later agreement to meet with Keohane

to discuss this equipment on April 5. They argue that these actions indicate that Chrysler believed shortly before and after the critical March 27 date that it bore responsibility for the equipment, and that these actions make no sense if Chrysler believed that it had been relieved of all responsibility by the Sublease.

We do not see, however, why this is so. Expression of a desire to meet with CSA does not necessarily mean Harris thought CSA was still free to back out of the Sublease. The jury could reasonably have determined that Harris sought a meeting despite his belief that CSA was bound by the Sublease, perhaps out of justifiable concern over Chrysler's continuing obligation on the *Lease*. Harris's later agreement to set up a meeting on April 5 between Chrysler and the CSA people can be interpreted as an attempt to resolve amicably the dispute that had arisen—not as an admission that Chrysler had extended CSA's back-out time. At least the jury may have thought this. Thus, we cannot say the jury decision on this factual matter requires a new trial. *DeMars v. Equitable Life Assurance Society of the United States*, 610 F.2d 55, 64–65 (1st Cir.1979).

2. CSA also argues that the trial court erroneously admitted into evidence a letter written in early 1980 by a CSA employee, Robert Janowski. At the time CSA had evidently missed a payment on the Sublease. Shawmut consequently asked Chrysler for a late fee under the Lease. A Chrysler employee asked Janowski why Shawmut was asking Chrysler for money. Janowski replied:

I have been in contact with the Shawmut bank regarding the above lease. Thru a misunderstanding Shawmut contacted you on a matter which Chrysler has no involvement.

Chrysler argued that this statement amounted to an admission by CSA that it was liable on the Sublease. CSA replied that the letter showed only that Janowski had read the Sublease in the CSA file, without knowing that CSA and Chrysler disputed its validity. Regardless, CSA now

says that the jury should not have seen the letter, for it is inadmissible hearsay. Fed. R.Evid. 802.

■ In our view, the Janowski letter was admissible because it is a "vicarious admission" and therefore falls outside the Federal Rules' definition of "hearsay." Fed.R. Evid. 801(d)(2)(D); *Astra Pharmaceutical Products, Inc. v. Occupational Safety and Health Review Commission*, 681 F.2d 69, 73 n. 8 (1st Cir.1982). CSA argues that the letter is inadmissible since it was not written by an employee with "management responsibility." *MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1143 (7th Cir.1983), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1984). But there is nothing in Rule 801(d)(2)(D) that requires an admission be made by a management level employee. Indeed, the case law codified by the Rule admitted statements by a radio operator, *KLM Royal Dutch Airlines v. Tuller*, 292 F.2d 775, 784 (D.C.Cir.), *cert. denied*, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), and a truck driver, *Martin v. Savage Truck Line, Inc.*, 121 F.Supp. 417 (D.D.C.1954). *See* Fed.R.Evid. 801(d)(2)(D) advisory committee note. Under the rules, an out-of-court statement, admitted to show the truth of what was said, is admissible against a party if it is the statement of "his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Janowski concededly was an employee at the time he wrote the letter. The issue is whether writing such a letter was within the scope of his duties.

■ The record shows that Janowski was a lower level employee, an accountant who prepared billing statements for CSA's lessees and sublessees. He responded to questions about bills from clients. He often consulted the lease files when doing so. In this case, when Chrysler asked why CSA had stopped paying Shawmut, Janowski went to the files, read what was there, and wrote his letter. Neither these facts nor anything else in the record requires a finding that the matter should have appeared to Janowski as so important that he lacked authority to write his routine response. The district court could reasonably have concluded that writing the response was within his duties and therefore treated the letter as a vicarious admission. *Independent Nail & Packing Co. v. Mitchell*, 343 F.2d 819, 823 (1st Cir.1965).

CSA makes two other related arguments about the letter, but they are not dispositive. It claims that Janowski should not have answered the Chrysler inquiry because he knew nothing about the prior CSA/Chrysler controversy; hence he was not qualified to express an opinion about what Chrysler should, or should not, have said to Shawmut. Insofar as this argument differs from CSA's argument discussed in the preceding paragraph, it must amount to a claim that the court should have kept the letter out of evidence as more prejudicial than probative, Fed.R. Evid. 403, or as an incompetent opinion, Fed.R.Evid. 701. Given CSA's ability to explain the significance of the letter to the jury, we do not believe the court need have kept it out on either ground. But, in any event, CSA did not object at trial on the basis of either of these rules, and its objection is therefore waived. Fed.R.Evid. 103(a)(1); *see* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 103[02], at 103–21 to –23 (specific ground of objection must be stated).

CSA also argues for inadmissibility on the ground that Janowski's opinion did not rest on his "personal knowledge." We note that the Advisory Committee for the Federal Rules of Evidence refused to make "personal knowledge" a prerequisite to the admissibility of "admissions." *See* Fed. R.Evid. 801(d)(2) & advisory committee note ("No guarantee of trustworthiness is required in the case of an admission.... [A]dmissions have enjoyed [freedom] from ... the restrictive influences of the opinion rule and the rule requiring first-hand knowledge."). Nonetheless, some courts have read a personal knowledge requirement into the vicarious admission branch of Rule 801(d)(2). *Litton Systems, Inc. v. AT*

& T, 700 F.2d 785, 816–17 (2d Cir.1983). *But see MCI Communications, Inc. v. AT & T,* 708 F.2d at 1143; *Mahlandt v. Wild Canid Survival and Research Center, Inc.,* 588 F.2d 626, 630–31 (8th Cir.1978); *In re A.H. Robins Co.,* 575 F.Supp. 718, 723–25 (D.Kan.1983).

The authorities imposing such a requirement, however, seem concerned lest the admission serve as a vehicle for admitting other *hearsay,* where, for example, the out-of-court declarant's statement simply reflects the statements of other people, which statements may themselves amount to inadmissible hearsay. *See United States v. Southland Corp.,* 760 F.2d 1366, 1376–77 n. 4 (2d Cir.), *cert. denied,* ——U.S.——, 106 S.Ct. 82, 88 L.Ed.2d 67 (1985); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 801(d)(2)(D)[01], 801–226 to –227 ("Gossip does not become reliable merely because it is heard in an office rather than a home."). Here, however, the source of Janowski's knowledge apparently was the Sublease itself, which he found while inspecting the file (at least, the district court may have thought so). Hence, CSA's complaint is not so much about the *source* of Janowski's knowledge, but about the conclusion that he drew from that source. This complaint, as we have said, appropriately takes the form of an objection based on Fed.R. Evid. 403 or Fed.R.Evid. 701—and as we have also said, these latter objections here were not made, and, in any event, they would have proved unavailing.

### B. *Indemnity*

1. Chrysler in its cross-complaint sought not only damages for "breach of contract" but also "indemnification" from CSA for any losses that Chrysler suffered as a result of having made a promise to pay rent under the Lease—which promise (under the Security Agreement) ran in favor of Union Mutual. The district court found for Chrysler on this theory; and CSA appeals. For the most part, the damages due on this claim and on the "breach of contract" claim are the same. Yet, a small potential difference in the measure of prejudgment interest requires us to consider CSA's argument that Chrysler's claim for indemnification was legally inadequate.

Chrysler's initial indemnification theory rests on the notion that Chrysler, as a kind of guarantor, paid a debt that CSA 'really' owed to Union Mutual. Chrysler says that, having paid this debt, it should step into Union Mutual's shoes (vis-a-vis CSA) or, in any event, as a matter of restitution, it should receive indemnity from CSA. *Restatement of Restitution* § 76 (1937) (one who discharges a "duty ... owed by him but which ... should have been discharged by" another "is entitled to indemnity from the other").

The problem with this theory is that CSA had no duty to pay money to Union Mutual, either on the Sublease or on Union Mutual's loan. The Sublease obligated CSA to Chrysler, not to Union Mutual. Union Mutual's loan was aimed at providing permanent financing for CSA's equipment purchase, replacing a temporary loan that Shawmut had initially made to CSA. Union Mutual made the loan to Shawmut; and, the loan was 'nonrecourse.' The parties made clear that the borrower was *not* personally liable. Rather, the record indicates that the parties intended Union Mutual to look to the collateral, and only to the collateral (namely, the Lease) for repayment of its loan.

Given the fact that CSA owes Union Mutual no duty to pay, Chrysler can claim neither contribution nor restitution from CSA. *See Restatement of Restitution* § 76 comment b ("Rule ... applies where two or more persons are subject to a *duty* to a third person.") (emphasis added). For the same reason, stepping into Union Mutual's shoes does not help Chrysler, for, in respect to CSA, those shoes won't walk the necessary distance.

Chrysler also asked the district court to read into the Sublease a promise by CSA to 'indemnify' Chrysler for any losses. It says that Massachusetts, like other states, not only honors "express" contractual promises by A to indemnify B, but will also, on occasion, "imply" such a promise

and enforce it. Courts have done so when the nature of the contract, its terms, the position of the parties, and other circumstances make it both reasonable and fair to believe that the parties intended such an obligation. *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Parks v. United States,* 784 F.2d 20, 25 (1st Cir. 1986); *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority,* 693 F.2d 1, 2–3 (1st Cir.1982); *Roy v. Star Chopper Co.,* 442 F.Supp. 1010, 1019 (D.R.I.1977), *aff'd,* 584 F.2d 1124 (1st Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *see also Decker v. Black and Decker Manufacturing Co.,* 389 Mass. 35, 449 N.E.2d 641, 644 (1983). The district court apparently implied a promise to indemnify on this basis.

■ Massachusetts law is unclear, however, about precisely when a court can read such a promise into a contract. *Compare Decker v. Black and Decker Manufacturing Co.,* 449 N.E.2d at 644 n. 2 ("[W]hether we would recognize such an implied contractual obligation [to indemnify], we leave for another day."), *with Fireside Motors, Inc. v. Nissan Motor Corp.,* 395 Mass. 366, 479 N.E.2d 1386, 1391 (1985) (assuming existence of implied indemnification). We conclude that Massachusetts would not do so here.

First, the parties (Chrysler and CSA) are unlikely to have 'meant' such a promise, because it would have been 99 percent redundant. The Sublease is expressly drawn so that CSA's obligations on the Sublease almost precisely mirror Chrysler's obligations on the Lease. The amount that CSA owes Chrysler, with one minor exception, equals the amount that Chrysler owes Union Mutual on the Lease, that is, $29,291 per month from April 1981 to April 1983, less approximately $145,000 for partial payments actually made. The only exception arises from the fact that the Lease and Sublease refer to the laws of different states for purposes of calculating any prejudgment interest. This fact, as we re-count at pp. 16–17, *infra,* means that Chrysler's debt on the Lease is slightly greater than CSA's. But, this is so only because Chrysler refused to mitigate this loss by paying Union Mutual and then suing CSA. Had Chrysler done so, it would have avoided even the small "extra interest payment" liability.

Second, there is no convincing reason to think the parties would have meant the contract to be taken as imposing an obligation upon CSA to pay such small extra amounts of consequential damage. Ordinarily, courts take the interest that a contract specifies as applicable to a late payment as the proper measure of damages suffered because of that late payment. *Loudon v. Taxing District,* 104 U.S. 771, 774, 14 Otto 771, 774, 26 L.Ed. 923 (1882); *Means v. Dierks,* 180 F.2d 306, 310 (10th Cir.1950); *Minick v. Associates Investment Co.,* 110 F.2d 267, 268 (D.C.Cir.1940); *Meinrath v. Singer Co.,* 87 F.R.D. 422 (S.D.N.Y.1980); *cf. Banewur v. Levenson,* 171 Mass. 1, 19, 50 N.E. 10 (1898) (Field, C.J., dissenting). Indeed, when a contract is silent in respect to interest for late payment of a fixed sum of money, the courts do not find liability for damages that the recipient might actually suffer (by not having the money on time); rather they simply give judgment for the fixed sum and apply the legal interest rate. W. Jaeger, *Williston on Contracts* § 1410 (3d ed. 1968). Chrysler cites no circumstance that convinces us that the parties meant their silence to reflect an intent to depart from the ordinary rule.

Third, we see nothing unfair or unreasonable in the fact that CSA's reimbursement falls slightly below Chrysler's liability. The parties have competent legal counsel; and they could easily have written the Lease and the Sublease to make the 'prejudgment interest' provisions correspond. Had the matter been of any importance, presumably they would have done so.

Fourth, the cases that Chrysler cites as having implied a promise to indemnify involve circumstances quite different from those at issue here. Typically, in those

cases an injured person (IP), such as an employee or a longshoreman, finds that a special principle of law, such as a workmen's compensation statute, forbids him from suing the person primarily responsible (PR) for his injury, *e.g.,* his employer who misused the machine, *Roy v. Star Chopper, Inc., supra,* or the stevedoring company which negligently stowed cargo, *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Co., supra.* Therefore, IP sues a secondarily responsible person (SR), such as the maker of the machine or the shipowner; and IP recovers, perhaps on a theory of strict liability. *Cf. Parks v. United States, supra* (joint tortfeasors). PR and SR have a contract, a term of which provides that PR will use the machine or stow cargo safely. SR, suing PR for "indemnity," argues that PR has breached this term. The court agrees, and reads into the contract a promise by PR to indemnify SR for his losses.

These cases are unlike the one before us 1) in respect to the ease with which existing contractual language could be read to provide for indemnity (for injuries which were, in a sense, foreseeable damages), and 2) in the basic fairness of doing so.

In sum, we do not believe that existing doctrines of "implied contractual indemnity" apply to this case. Rather, in this respect, the parties should be held to the promises that they expressly made.

## 2. *Keohane's liability.*

The district court imposed personal liability to indemnify Chrysler upon Keohane as well as CSA because Keohane was CSA's principal officer and directed CSA to breach the Sublease. The court wrote: "An agent of a corporation who engages in conduct constituting a wrong to a third person is, with exceptions that do not apply here, subject to personal liability even though the corporation is also liable for the wrong accomplished within the scope of his employment."

As we read Massachusetts law, however, Keohane cannot be held personally liable in this case. Under Massachusetts law, a high corporate officer may be personally liable for the torts a corporation commits at his direction. *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 907 (1st Cir.1980); *Refrigeration Discount Corp. v. Catino,* 330 Mass. 230, 235–36, 112 N.E.2d 790 (1953). But, the officer ordinarily is not liable for the corporation's breach of contract. Mass.Gen.Laws ch. 156, § 38 specifically says (with exceptions that do not apply here) that "no suit shall be maintained against a stockholder or officer for the debts or contracts of the corporation." If CSA is liable for indemnity in this case, its liability rests upon a contract, whether its contractual promise to indemnify is express or implied. We do not believe Massachusetts would hold Keohane personally responsible for that liability.

Chrysler points to an exception to the statutory rule. Massachusetts, it says, will hold the officer personally liable for inducing a company to breach its contract if the officer "acted out of malevolence, that is, with 'actual' malice." *Gram v. Liberty Mutual Insurance Co.,* 384 Mass. 659, 663, 429 N.E.2d 21 (1981); *Laurendeau v. Kewaunee Scientific Equipment Corp.,* 17 Mass.App. 113, 123, 456 N.E.2d 767 (1983). This appears to be a tort theory of liability that Chrysler did not plead. In any event, Chrysler points to only two facts as showing Keohane's "malice": 1) it says that breaking the Sublease promise saved CSA money; and 2) it says that CSA's refusal to pay "obviously" violated its contractual promise.

The first fact does not show (in the words of Chrysler's brief) "personal ill will or purpose to harm Chrysler," however, because there was at least an equivalent benefit to CSA. Nor does the second sort of evidence show "malice," where as here, there is no independent evidence that Keohane acted for other than a corporate purpose. Otherwise the 'exception' would simply make corporate officers liable for "obvious" breaches of contract—a result inconsistent with the statutory proscription of officer liability in contract and debt actions. In the absence of malice, one who

knowingly and voluntarily contracts with a corporation must look to the corporation, not to its officers, for redress, even for "obvious" failures to perform contractual promises. Massachusetts privileges even intentional interference with contract rights by the employees of a contracting corporation if, as here, the defendant acted for a purpose that was "part of his employment responsibilities." *Steranko v. Inforex, Inc.*, 5 Mass.App. 253, 272–73, 362 N.E.2d 222, 235–36 (1977); *Caverno v. Fellows*, 300 Mass. 331, 336–37, 15 N.E.2d 483 (1938). Directing CSA to breach an unfavorable contract, if that is what happened, was within the scope of President Keohane's duties. Since Chrysler does not show us record evidence that would allow a factfinder to find "malice," the judgment of personal liability against Keohane cannot stand, and it would not stand even if Chrysler's contractually implied indemnification theory (discussed at pp. 9–11, *supra*) were tenable.

### III

#### *Chrysler's Appeal*

The district court found that Chrysler broke a promise contained in a clause of the Lease that the financial community characterizes as requiring payment "come hell or high water." That clause states:

if such assignment [of the Lease] was made for collateral purposes, the rights of any such assignee in and to the rents and other sums payable by [Chrysler] under any provisions of this Lease shall be absolute and unconditional and shall not be subject to any abatement whatsoever, or to any defense, set-off, counterclaim or recoupment whatsoever....

Given this language forbidding Chrysler from raising defenses to payment, Chrysler, in order to avoid liability, must argue that the parties, in one way or another, agreed to make this clause ineffective. In particular, Chrysler argues 1) that Union Mutual agreed to a "novation," in effect substituting CSA for Chrysler under the Lease and thereby releasing Chrysler from its promises; 2) that Union Mutual autho-

rized Shawmut to release Chrysler from its Lease promises and that Shawmut did so; 3) that Union Mutual ratified Shawmut's unauthorized release of Chrysler; 4) that Union Mutual authorized CSA to release Chrysler from its Lease promises and that CSA did so; 5) that Union Mutual ratified CSA's unauthorized release of Chrysler; 6) that Union Mutual waived its right to enforce the Lease, and 7) that courts should not allow Union Mutual to enforce the Lease because of estoppel or laches.

■ The basic weakness in all Chrysler's arguments lies in the facts upon which Chrysler must rely to support them. In its efforts to invoke various exculpatory legal doctrines, Chrysler points out that Union Mutual accepted Lease payments from CSA and that Union Mutual expected and hoped CSA would keep on paying when payments were missed. In its brief, Chrysler says that Union Mutual "knowingly accepted payments that originated from entities other than Chrysler"; that when CSA first stopped making the monthly rental payment, Union Mutual went to CSA and asked it to continue; that Union Mutual assessed a "late fee" against CSA when CSA missed payments; and that, in 1981 when CSA seemed to have permanently stopped payments, Union Mutual negotiated with CSA in an effort to change CSA's mind.

One wonders, however, how these facts to which Chrysler points show that Union Mutual meant to look only to CSA for its money. How can they show that Union Mutual meant to drop the extra security or 'guaranty' that Chrysler's promise provided? How can they show more than Union Mutual's having looked to CSA *as well as* to Chrysler (as backup) for repayment of its loan? In our view, no reasonable juror could answer these questions in Chrysler's favor. Chrysler cannot avoid liability here any more than a homeowner can avoid mortgage liability simply because the bank, for a time, accepts monthly mortgage checks from the homeowner's tenant.

Of course, one might ask if the factual or legal details make the circumstances here

somehow special. After all, Chrysler is not really like the homeowner. It did not borrow the money from Union Mutual, nor did its repayment promise initially run in Union Mutual's favor. Given Chrysler's knowledge of the circumstances, the ironclad language, and the purpose of the assignment, however, any "special circumstances" seem to favor Union Mutual, not Chrysler. For example, Shawmut's having borrowed the money to refinance CSA's machines, CSA's recovery of possession of the machines, CSA's Sublease promise to Chrysler to make monthly payments, and CSA's regular payments (of Chrysler's debt) over four years, all make it understandable why Union Mutual first contacted CSA when payment stopped. Moreover, as a matter of law, the kind of Lease promise Chrysler gave is a specially binding promise—one that, legally speaking, treats Union Mutual (in respect to that promise) much like a holder in due course. *See* Mich.Comp.Laws Ann. § 440.9206(1) ("an agreement by a . . . lessee that he will not assert against an assignee any claim or defense which he may have against the seller or lessor is enforceable . . . except as to defenses of a type which may be asserted by a holder in due course of a negotiable instrument"); *cf. Bankers Trust Co. v. Litton Systems, Inc.,* 599 F.2d 488, 494 (2d Cir.1979). As one court has written:

> The essential practical consideration requiring liability as a matter of law in these situations is that these clauses are essential to the equipment leasing industry. To deny their effect as a matter of law would seriously chill business in this industry because it is by means of these clauses that a prospective financier-assignee of rental payments is guaranteed meaningful security for his outright loan to the lessor. . . .

*Philadelphia Savings Fund Society v. Deseret Management Corp.,* 632 F.Supp. 129 (E.D.Pa. 1985); *see* R. Contino, *Legal and Financial Aspects of Equipment Leasing Transactions* 29 (1979); B. Fritch & A. Reisman, *Equipment Leasing-Leveraged Leasing* 907–12 (2d ed. 1980).

These general considerations provide sufficient reason to reject most of Chrysler's arguments, though we shall consider the more important of those arguments individually.

### A. *Novation.*

■ Chrysler argues *novation,* that Union Mutual agreed to *substitute* CSA for Chrysler in respect to the Lease. *See George Realty Co. v. Gulf Refining Co.,* 275 Mich. 442, 448, 266 N.W. 411, 413 (1936); *Chicago Boulevard Land Co. v. Nutten,* 268 Mich. 541, 256 N.W. 541 (1934). Union Mutual correctly points out that "novation" is an affirmative defense which Chrysler did not plead. Fed.R.Civ.P. 8(c); *Jakobsen v. Massachusetts Port Authority,* 520 F.2d 810, 813 (1st Cir.1975). Even if, as Chrysler urges, we consider that Chrysler effectively raised its "novation" argument when it argued below under the theory "modification" (ordinarily considered a distinct contract theory, *compare Restatement (Second) of Contracts* § 89 (modification) *with id.* § 280 (novation)), we would still find it inadequate in light of our discussion in the preceding paragraphs. Indeed, Michigan courts have specifically held that "payment on a debt by a third party which is accepted by a creditor does not establish a novation." *Macklin v. Brown,* 111 Mich.App. 110, 113, 314 N.W.2d 538, 540 (1981) (per curiam); *Hutchings v. Securities Exchange Corp.,* 287 Mich. 701, 708, 284 N.W. 614, 617 (1939); *cf. Lipson v. Adelson,* 17 Mass.App. 90, 94, 456 N.E.2d 470, 473 (1983) ("Nor would an intention to work out a settlement and avoid litigation by itself indicate an intention to discharge pre-existing obligations.").

The cases Chrysler cites in which courts have found novation all involve quite different factual circumstances. They involve written evidence of a release or testimony about an oral agreement of release or both. *See Johnston v. Holiday Inns, Inc.,* 565 F.2d 790, 797 (1st Cir.1977) (written agreement transferring obligation of the obligor and testimony that plaintiff demanded a new guaranty, implying release from old

guaranty); *Chicago Boulevard Land Co. v. Nutten*, 268 Mich. 541, 256 N.W. 541 (1934), (written consent to assignment, letters and internal documents indicate release); *Fauci v. Denehy*, 332 Mass. 691, 127 N.E.2d 477 (1955) (oral agreement raised factual issue of novation). *Cf. Riber v. Morris*, 279 Mich. 344, 272 N.W. 700 (1937) (acceptance of debtor's note raises presumption of novation).

### B. *Agency.*

■ Chrysler argues that Union Mutual *released* Chrysler from its promise by agreeing to, or accepting, Shawmut's release of Chrysler when Shawmut consented to the Sublease. Shawmut's consent to the Sublease, however, does not seem to release Chrysler. It reads:

> The undersigned, the Lessor [Shawmut as CSA's assignee] in the Lease mentioned and described in the foregoing Sublease between Chrysler Corporation and Computer Systems of America, Inc., hereby consents to this Sublease and all provisions thereof, *provided, however, Lessee [Chrysler] will remain responsible to Lessor for all provisions and obligations under the Lease.*

(Emphasis added.)

In any event, the "Basic Agreements" setting up the transaction make clear that Shawmut did not speak for Union Mutual. Article 1.3 of the Trust Agreement says:

> the Trustee [Shawmut] shall have no power, right, duty or authority to manage, control, possess, sell, lease, dispose of or in any manner deal in or with the Equipment .... [T]he power and authority of the Trustee ... [is] subject at all times to the rights of the Lender [Union Mutual] and any Holders hereunder and under the Loan Agreement and the Security Agreement.

Chrysler's argument that CSA released Chrysler from the Lease by agreeing to the Sublease is without merit for the same reasons: 1) the Sublease *reaffirms* the Lease rather than replaces it, and 2) CSA was neither actually nor apparently authorized to release Chrysler on behalf of Un-

ion Mutual. Finally, even if Shawmut or CSA had released Chrysler, nothing Union Mutual did could be interpreted as ratification of that act for the general reasons given at pp. 12–13, *supra.*

### C. *Waiver, Estoppel and Laches.*

■ Chrysler argues "waiver," and "estoppel," but these arguments also founder on the general considerations mentioned on pp. 12–13, *supra.* In addition, Union Mutual's conduct cannot reasonably be seen as a "waiver," in light of *Restatement (Second) of Contracts* § 84(1) comment d, which makes clear that the waiver doctrine applies only to "procedural or technical" conditions of performance. *See also id.* comment c ("[W]here a promise to disregard the nonoccurrence of the condition materially affects the value received by the promisor ... the promise is not binding."). Chrysler's estoppel theory requires "justified reliance." And Chrysler's reliance (if any) on Union Mutual's acceptance of payments from CSA is not justified, for Michigan law makes clear that such conduct does not amount to an implied release. *Macklin v. Brown, supra; Hutchings v. Securities Exchange Corp., supra; cf. Dahrooge v. Rochester German Insurance Co.*, 177 Mich. 442, 452, 143 N.W. 608, 611 (1913).

■ Chrysler's claim of "laches" is inadequately supported given the facts that 1) Union Mutual had no reason to sue before CSA finally stopped paying rent and 2) it filed suit only four months thereafter.

We conclude that Chrysler's appeal is without merit.

### IV

### *Union Mutual's Appeal*

Union Mutual appeals three aspects of the district court's judgment against Chrysler. First, it argues that the court incorrectly calculated the amount remaining due on the Lease. In particular, it says that the court should not have subtracted (from the amount still due on the Lease) the

money CSA paid Union Mutual after March 15, 1981 (about $145,000) from the proceeds of its sub-subleases of the equipment.

In order to understand this argument, one must remember that Union Mutual loaned CSA the money needed to buy the equipment and that it took the Lease containing Chrysler's promise as security. Since Union Mutual's other security (the machines) is apparently of little or no value, Union Mutual now looks to Chrysler's Lease promise to get back the money still owed on the loan. In fact the parties from the outset all looked to Chrysler's Lease promise as the source of loan repayment. The money still owed on the loan is at this point somewhat greater than the amount Chrysler still owes on the Lease because the Note embodying the loan (unlike the Lease, *see* pp. 15–16, *infra*) allows Union Mutual to add to the debt its attorneys' fees for this action.

Thus Union Mutual finds it advantageous to argue that the $145,000 in payments it received from CSA as the proceeds of its sub-subleases, while reducing the amount still owed on the loan, did not reduce the amount Chrysler still owed on the Lease.

While we believe we understand why Union Mutual makes its argument, we do not believe the argument is correct. The $145,000 in question consisted of proceeds from CSA's sub-subleases. Those paying the money sent it to CSA, which, in turn, sent it to Union Mutual. CSA, when it sent the money, and Union Mutual, when it received the money, knew or should have known that it had the same status as CSA's previous payments, namely, payments intended to meet its own obligations on its Sublease by partially discharging Chrysler's liability on the Lease. The district court properly considered these payments as "lease obligation" payments reducing the amount Chrysler still owed.

Union Mutual argues that crediting these payments against Chrysler's Lease obligation has the effect of diminishing its collateral as it receives payment, in contrast to ordinary secured transactions.

But the conclusive answer to this argument is what Union Mutual has told us throughout this appeal: The security here was not ordinary; it consisted of a promise to pay rent, and by its nature it would diminish in value as the rent was paid, whether paid by Chrysler or by some other entity paying for Chrysler. The cases that Union Mutual cites simply hold that commercial lessees agreeing to "hell or high water" clauses are bound in various circumstances. They do not prohibit crediting third party payments against amounts due under the Lease. *See, e.g., Bankers Trust Co. v. Litton Systems, Inc.*, 599 F.2d at 492–93 (fraud in the inducement not a defense against assignee-lender); *Equico Lessors, Inc. v. Mines*, 84 Cal.App.3d 374, 148 Cal. Rptr. 554 (1978) (nondelivery of equipment and disallowance of tax deductions no defense).

Union Mutual also argues that an earlier order, in which the district court initially did *not* subtract the $145,000, is the "law of the case." The short and conclusive answer to this argument is that the district court's initial order (which it called a "guideline") was interlocutory, and the district court remained free to correct its order. *United States v. United States Smelting, Refining & Mining Co.*, 339 U.S. 186, 199, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950); 1B *Moore's Federal Practice* ¶ 0.404[4.–1], at 124 n. 4 ("[U]ntil entry of judgment, [interlocutory orders] remain subject to change at any time. The doctrine of law of the case does not limit the power of the court in this respect."); *Gregg v. U.S. Industries, Inc.*, 715 F.2d 1522, 1530 (11th Cir.1983), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2173, 80 L.Ed.2d 556 (1984).

Second, Union Mutual says the district court should have awarded it attorneys' fees. It acknowledges that under the ordinary American rule, each side pays its own attorney, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975); *H & L Heating Co. v. Bryn Mawr Apartments of Ypsilanti, Ltd.*, 97 Mich.App. 496, 506, 296 N.W.2d 354, 358 (1980), but it

says that here, Chrysler promised to pay attorneys' fees. Union Mutual properly does not find Chrysler's promise to pay in the Note that embodies the loan, for Chrysler is not bound by the terms of the Note; the Note's promise of such fees simply increases the amount due on the loan—an amount which Union Mutual seeks to collect from the (inadequate) balance due on the Lease. Rather, Union Mutual says Chrysler promised in the Lease itself to pay attorneys' fees incurred by Union Mutual in its effort to collect the rent that is due.

■ The problem with Union Mutual's argument is that this is not what the Lease says. The clause to which it points reads as follows:

> If Lessee [Chrysler] fails to perform any provision on its part contained herein Lessor [CSA and by subsequent assignment Shawmut, and, arguably, Union Mutual] may, but shall not be required to, perform such provision. The costs of such performance and the amount of the Lessor's attorney's fees and expenses, shall be paid by Lessee to Lessor promptly upon notice thereof.

For Union Mutual to sue Chrysler for rent is not the act of a lessor 'performing' one of Chrysler's obligations under the Lease; it is the act of a *lender*, forcing *Chrysler* to 'perform' the obligation. Thus, the suit does not fall within the literal language of the clause. *Cf. DeVries v. Brydges*, 57 Mich.App. 36, 41, 225 N.W.2d 195, 198 (1974). More important, as we read the contract, this clause aims to reimburse the Lessor for expenses incurred should Chrysler fail to carry out certain *other* Lease obligations, for example, the obligation to keep the equipment in "first class appearance and repair," to pay taxes and other assessments, to comply with state and federal laws and other duties—which obligations fall more naturally within its language. Neither the clause's language nor its purpose cover attorneys' fees for nonpayment of rent. *Cf. Alland v. Consumers Credit Corp.*, 476 F.2d 951 (2d Cir.1973)

(construing costs of suit to include attorneys' fees).

■ Finally, Union Mutual says that the court incorrectly calculated the amount of prejudgment interest due on the rent Chrysler owes. Since the Lease specifically states that Michigan law is to govern disputes, we must look to that state's law. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 487 (1941) (court applies choice of law principles of jurisdiction in which it sits); *Morris v. Watsco, Inc.*, 385 Mass. 672, 433 N.E.2d 886 (1982) (Massachusetts awards prejudgment interest in accordance with the law of the jurisdiction whose law governs the cause of action); *see also Glick v. White Motor Co.*, 317 F.Supp. 42, 45–46 (E.D.Pa.1970), *aff'd*, 458 F.2d 1287 (3d Cir. 1972).

The relevant provision of the Michigan statute reads:

> interest shall be calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12 percent per year compounded annually unless the judgment is rendered on a written instrument having a *higher* rate of interest. In that case interest shall be calculated at the rate specified in the instrument. ...

Mich.Comp.Laws Ann. § 600.6013(4) (emphasis added). This statute requires that interest from the time of filing the complaint be calculated at no less than 12 percent per year compounded annually. *Cf. McGraw v. Parsons*, 142 Mich.App. 22, 369 N.W.2d 251, 253–54 (1985). While the Lease itself provides for interest on late payments of 10.5 percent, its provision does not govern once the complaint was filed, for the contract's rate is *lower*, not *higher*, than 12 percent.

■ The district court calculated prejudgment interest at 10.5 percent, apparently because it looked to the Sublease which applied Massachusetts, not Michigan, law; and Massachusetts law, in contrast with the Michigan statute, provides that the stated contract rate supersedes the statutory rate (currently also 12 percent)

whether it is higher or lower. Mass.Gen. Laws. ch. 231, § 6C. *See Sargeant v. Commissioner of Public Welfare*, 383 Mass. 808, 824, 423 N.E.2d 755, 765 (1981). Chrysler says that Union Mutual did not call the court's attention to the proper statute. Chrysler itself, however, referred the court to the Michigan statute and to the correct choice of law doctrine. Because the matter was brought with sufficient clarity to the court's attention, we do not consider it to have been waived.

■ Chrysler, in an effort to defend the 10.5 percent calculation, argues that the Michigan statute does not mean what it says, but rather means that *lower*, as well as *higher*, contractual interest rates supersede the 12 percent statutory figure. Yet, Chrysler has cited no case, arising under either this statute or a similar predecessor statute, that offers support for this argument. Rather it cites one case, *Moore v. Department of Military Affairs*, 88 Mich. App. 657, 661, 278 N.W.2d 711, 712–13 (1979), involving a significantly different statute, Mich.Comp.Laws Ann. § 600.6455 ("judgment upon a contract expressly providing for interest shall carry interest at the rate provided by said contract"). It cites a second case that holds parties can agree to settle a suit on terms that reduce or eliminate the statutory prejudgment interest to which one of them might otherwise be entitled. *McGrath v. Clark*, 89 Mich.App. 194, 197–98, 280 N.W.2d 480, 482–83 (1979). Neither of these cases is on point.

Union Mutual, too, has difficulty finding cases to support its own position. Yet, given the clear statutory language, the absence of relevant case law likely reflects the absence of any basis for contesting Union Mutual's position, rather than any unsettled condition of the law. We conclude that the district court should use the Michigan rate of 12 percent compounded annually to calculate the interest due.

## V

### Chrysler's "Cross-Appeal"

Chrysler asks us to increase the amount of its judgment against CSA to reflect the increased prejudgment interest that Part IV awards Union Mutual against Chrysler. As we have pointed out, however (see Part II.B.1 at pp. 9–11, *supra*), Chrysler has no legal right to such an increase. Its contract with CSA (the Sublease) calculates prejudgment interest on the basis of Massachusetts, not Michigan, law; and its claim for indemnity is legally invalid.

■ Chrysler asks for the increase as a matter of "equity." But, it seems equitable to us to require Chrysler to pay this comparatively small amount. After all, Chrysler could have avoided paying *any* prejudgment interest had it simply kept its promise to Union Mutual. And Chrysler knew that Union Mutual counted upon *Chrysler*'s promise, not *CSA*'s promise, as security for its loan. Chrysler broke that promise and, in effect, made Union Mutual wait for (and sue for) its money while Chrysler sued CSA. The old maxim says 'he who seeks equity, must do equity.' And, given this maxim, Chrysler is not in a strong position to ask this court for the additional money. *Compare Natasha, Inc. v. Evita Marine Charters, Inc.*, 763 F.2d 468 (1st Cir.1985).

■ Finally, Chrysler argues that Massachusetts law requires an additional prejudgment interest payment. The district court calculated interest according to the terms of the Sublease, namely, at 10.5 percent. Chrysler seems to want additional "prejudgment" interest, calculated and paid on the amount of interest for which the Sublease provided. The relevant Massachusetts statute says that in a contract action "interest shall be added ... to the amount of damages, *at the contract rate,* if established, or at the rate of twelve per cent ... from the date of the breach or demand." Mass.Gen.Laws ch. 231, § 6C (emphasis added). The district court followed this instruction. The statute does not suggest that prejudgment interest at the contract rate should be calculated and paid twice; and we see no reason to do so in respect to the prejudgment interest peri-

od where the effect of doing so would be a double payment for the use of Chrysler's money. *See Sargeant v. Commissioner of Public Welfare,* 383 Mass. 808, 824, 423 N.E.2d 755, 765 (1981).

We find the remainder of the parties' arguments without merit.

To summarize, we find the district court's decisions correct, with the exceptions mentioned. *The judgment against CSA in No. 85–1486 is affirmed. The judgment imposing liability on Frank Keohane in No. 85–1486 is reversed. The judgment against Chrysler in Nos. 85–1485 and 85–1504 is vacated and the case remanded for the purpose of recalculating prejudgment interest at 12 percent compounded annually.*