681 F.2d 69
 10 Fed. R. Evid. Serv. 1087, 10 O.S.H.
Cas.(BNA) 1697,
1982 O.S.H.D. (CCH) P 26,109
ASTRA PHARMACEUTICAL PRODUCTS, INC., Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and
Secretary of Labor, Raymond J. Donovan, Respondents.
 No. 81-1672.
 United States Court of Appeals,
First Circuit.
 Argued May 4, 1982.
Decided June 22, 1982.
 
 William J. LeDoux, Worcester, Mass., with whom James E. Wallace, Jr., and Bowditch & Dewey, Worcester, Mass., were on brief, for petitioner.
 Charles I. Hadden, Asst. Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., with whom T. Timothy Ryan, Jr., Sol. of Labor, Washington, D.C., Albert H. Ross, Regional Sol., Boston, Mass., Frank A. White, Associate Sol. for Occupational Safety and Health, and Allen H. Feldman, Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., were on brief, for respondents.
 Before ALDRICH, CAMPBELL and BREYER, Circuit Judges.
 CAMPBELL, Circuit Judge.
 
 
 1
 Astra Pharmaceutical Products, Inc. ("Astra") appeals from a decision of the Occupational Safety and Health Review Commission (OSHRC) pursuant to 29 U.S.C. § 660(a). The Commission found Astra in violation of 29 C.F.R. § 1910.132(a)[1] for failure to see that one of its employees, Paul Sund, was using certain items of protective equipment when a chemical vat at which he was working overflowed, seriously injuring him.
 
 
 2
 A one-day hearing was conducted on the matter by an administrative law judge (ALJ). At that hearing the Secretary of Labor presented two witnesses: an Occupational Safety and Health Administration Inspector, Mr. Goyda, who inspected the Astra plant in Worcester, Massachusetts on the day following the accident, and a Mr. Ratner, an expert industrial hygienist with OSHA who had never visited the Astra facility. Astra offered no evidence of its own.
 
 
 3
 The Secretary's witnesses, particularly Mr. Goyda, established that an accident had occurred at the Worcester plant on November 7, 1978, when a vat used in the production of chloroacetyl xylidine (an intermediate chemical in the production of the anesthetic Xylocaine-an Astra product) overflowed, spraying toxic chemicals[2] in the immediate area. Paul Sund, an Astra employee of 20 years' experience who was tending the vat, was in the area at the time and was subsequently hospitalized as result of the overflow.
 
 
 4
 Mr. Goyda arrived at the Astra plant the following day to make his inspection. In the course of his investigation he spoke with several employees who had helped to wash Sund with water after the accident. Goyda testified particularly to a conversation with a Mr. Carlson-one of Sund's fellow employees. Goyda's testimony on direct examination-which was characterized as hearsay by the ALJ-was as follows:
 
 
 5
 Q. Did he (Mr. Carlson) relate to you his observation of Mr. Sund on November 7, 1978, immediately after this so-called accident occurred?
 
 
 6
 A. Yes, he did.
 
 
 7
 Q. What did he tell you?
 
 
 8
 A. That Mr. Sund was covered with chemical from head to toe.
 
 
 9
 Q. Where did he see Mr. Sund, do you know?
 
 
 10
 A. They had come back-I think he saw him coming down the steps from the room containing the reactor vessel involved in the accident.
 
 
 11
 Q. So the reactor is on the second floor of this building?
 
 
 12
 A. Yes.
 
 
 13
 Q. And what happened then? What did Mr. Carlson say happened at that point?
 
 
 14
 A. They started administering Mr. Sund.
 
 
 15
 Q. In what way?
 
 
 16
 A. Cleaning him off with water, showering him.
 
 
 17
 Q. Did he tell you where this chemical material was on Mr. Sund's body?
 
 
 18
 A. Completely covered.
 
 
 19
 Q. Did this include his head?
 
 
 20
 A. Yes.
 
 
 21
 Q. Did this include his mouth area?
 
 
 22
 A. Yes.
 
 
 23
 Mr. Goyda also spoke with a Mr. Mandella, Paul Sund's supervisor, regarding the type of protective equipment normally used by Paul Sund. Goyda's testimony regarding what Mr. Mandella told him was as follows:
 
 
 24
 Q. Did you discuss the wearing of a (sic) personal protective equipment with Mr. Mandella?
 
 
 25
 A. Yes.
 
 
 26
 Q. What did he tell you with respect to the Company's policy, if any, with respect to the wearing of personal protective equipment by Mr. Sund while he's engaged in producing this product which you have described?
 
 
 27
 A. He explained the personal protective equipment that was worn in that area.
 
 
 28
 Q. What was that personal protective equipment?
 
 
 29
 MR. LeDOUX. Objection. Is the question what was it or what did Mr. Mandella tell him?
 
 
 30
 Q. What did Mr. Mandella tell you about personal protective equipment being worn in the area?
 
 
 31
 A. He explained that during certain phases of the operation, a respirator, chemical goggles, and gloves were worn.
 
 
 32
 Q. Were these provided by the Company?
 
 A. Yes, I would assume so.[3]
 
 33
 The Secretary also demonstrated through its two witnesses and various exhibits that Astra was aware that the chemicals involved in the accident were hazardous and that "full body protection"-including, according to both Mr. Goyda and Mr. Ratner, boots, jacket, pants and a full face shield all impervious to the chemicals-would have been the appropriate protection required under industry standards.[4] As previously noted, Astra chose to put on no evidence to rebut the Secretary's case.
 
 
 34
 After all the evidence was in, the ALJ issued a decision in which he vacated the Secretary's 29 C.F.R. § 1910.132(a) citation and proposed $800 penalty on the grounds that no evidence had been submitted of what Sund was actually wearing at the time of the accident. The ALJ pointed out that neither supervisor Mandella nor employee Carlson were called as witnesses[5] and was of the view that, without their testimony, "the allegation that Astra did not require employees to use protective clothing when needed (is) unsupported." The ALJ's decision was then appealed to the Review Commission by the Secretary. The Commission reversed, stating,
 
 
 35
 Mandella's statement (to Goyda) regarding Astra's personal protective equipment policy, having been specifically limited to a respirator, goggles, and gloves, is probative evidence from which we find that the injured employee (Sund) used no greater protection while making chloroacetyl xylidine.
 
 
 36
 This appeal followed with Astra's argument pitched essentially on the same grounds as was the ALJ's opinion.
 
 
 37
 Our review of the Commission's decision is a narrow one especially where, as here, the chief dispute on appeal is factual. We will affirm the Commission's decision so long as it is supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a). See General Dynamics v. OSHRC, 599 F.2d 453, 464 (1st Cir. 1979). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938), taking into account "whatever in the record fairly detracts from its weight." Id., 340 U.S. at 488, 71 S.Ct. at 464. Where the Commission draws factual inferences from the evidence presented, courts will generally affirm so long as the inferences are reasonable and supported by substantial evidence. See American Iron & Steel Institute v. OSHA, 577 F.2d 825, 831 (3d Cir. 1978), cert. dismissed sub nom. Republic Steel Corp. v. OSHA, 448 U.S. 917, 101 S.Ct. 38, 65 L.Ed.2d 1180 (1980).
 
 
 38
 Astra argues vigorously that supervisor Mandella's statement regarding the "policy" of the plant to require "a respirator, chemical goggles, and gloves," upon which the Commission relied in reaching its decision, in no way suggests, as the Commission found, that employees were limited to these pieces of equipment or that Sund was wearing no more than this at the time of the accident. Rather, Astra claims that the statement is simply silent on these points and should not alone be sufficient to support the inference the Commission drew. Mandella's statement, however, which is susceptible to several interpretations, is not the only evidence in the record which supports the inference drawn by the Commission. Employee Carlson reported that Sund's body was "completely covered" with chemicals from "head to toe," including his head and mouth area. Such testimony indicates that Sund's person was extensively exposed to the toxic chemicals at the time of the overflow. Such exposure, when combined with the fact that Sund was seriously injured and hospitalized after the accident,[6] in turn strongly suggests a lack of adequate protective clothing. We note additionally that had Sund been wearing either the required "full face shield," see note 4, supra, or even the respirator mentioned by Mandella,[7] it is unlikely that Carlson would have observed chemicals around Sund's "mouth area."
 
 
 39
 We recognize that neither Carlson's nor Mandella's observations are free from ambiguity. Astra argues with some force, for example, that Carlson's statement "is not probative of what (Sund) was wearing at the time of the accident. One could be completely covered (with chemicals) while wearing a suit of armor or while completely naked."
 
 
 40
 However, Carlson's and Mandella's statements[8] must be read in combination, and also in light of all other evidence in the record. Taken as a whole, we believe the record supports the Commission's inference that Sund was inadequately protected.[9] As noted above, had Sund been wearing the required full face mask or even the respirator, he would likely have avoided getting chemicals around his mouth, and it is unlikely that Carlson would have described Sund in the manner he did. Moreover, the suggestion that Sund's "body" was "completely covered," while an obvious exaggeration if taken literally (we would assume that Sund wore at least some clothing while at work), nevertheless reasonably suggests, when combined with Sund's subsequent hospitalization, some type of dangerous "body" exposure-exposure which would have been avoided by "full protective clothing" impervious to the chemicals. See note 4, supra. Finally, with Carlson's statements as background, Mandella's statement that Sund was provided with a "respirator, goggles and gloves" as a matter of Company policy reasonably supports an inference that Sund used no more (and perhaps less) than this limited equipment on the day he was injured.[10] Put another way, had Sund used all of the protective gear established as necessary by the Secretary, it seems reasonable to assume that both Carlson's description of Sund after the accident and Mandella's statement of equipment "policy" would have been substantially different.
 
 
 41
 Astra, of course, was well positioned to set the record straight on what Sund was wearing if these inferences were incorrect. Knowledge as to how Sund was usually attired and witnesses who could prove what Sund wore on the day in question were fully available to it. Astra could have called supervisor Mandella and employee Carlson to testify, if they could, that more and different equipment was sometimes used and that Sund, in particular, had been using more protection when the accident occurred. While the Secretary had the burden of proving its case by substantial evidence, what constitutes substantial evidence varies with the circumstances. The "evidence a reasonable mind might accept as adequate to support a conclusion" is surely less in a case like this where it stands entirely unrebutted in the record by a party having full possession of all the facts, than in a case where there is contrary evidence to detract from its weight. See, e.g., Noranda Aluminum, Inc. v. OSHRC, 593 F.2d 811, 814 & n.5 (8th Cir. 1979) (decision to leave Secretary's case unrebutted "a legitimate but always dangerous defense tactic in litigation"); Stephenson Enterprises, Inc. v. Marshall, 578 F.2d 1021, 1026 (5th Cir. 1978). Thus, thin as the underlying evidence was, we find it sufficient in these circumstances.
 
 
 42
 Astra is not aided by the fact that the ALJ would have vacated the citation. The Commission's decision in no way turned on credibility or other factors peculiarly the province of a trial examiner. See Universal Camera Corp. v. NLRB, 340 U.S. at 496, 71 S.Ct. at 468. The Commission simply disagreed with the ALJ regarding the inference to be drawn from the available record evidence. Where, as we believe was true here, the agency's choice was reasonable-whether or not another inference might also have been reasonable-" it is the agency's choice that governs." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). See also Universal Camera Corp. v. NLRB, 340 U.S. at 488, 71 S.Ct. at 464. We accordingly affirm.
 
 
 43
 Astra additionally has requested that we remand this case for a more particularized finding by the Commission to support its imposition of the $800 penalty.[11] Since the Secretary has no objection to such a remand, we grant Astra's request.
 
 
 44
 Affirmed in part; remanded in part.
 
 
 
 [1]
 29 C.F.R. § 1910.132(a) provides in full as follows:
 Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.
 
 
 [2]
 The chemicals used in the process included benzene, chloroacetyl chloride, xylidine, and sodium carbonate monohydrate. Mr. Ratner's testimony established that all of these chemicals except perhaps sodium carbonate monohydrate were hazardous to health if brought into contact with skin
 
 
 [3]
 Goyda was also asked if he had questioned anyone at the plant regarding what Sund was actually wearing immediately after the accident. Goyda replied that he had not inquired about this
 
 
 [4]
 The Secretary introduced various pages from the "Fire Protection Guide on Hazardous Materials" dealing with the protective equipment necessary for handling the chemicals involved in the accident. Mr. Goyda testified that Astra's safety director referred to the publication during Goyda's inspection. For "Benzene" the Guide recommended a "self-contained breathing apparatus" which, Ratner testified, has a "full face shield." For "Chloroacetyl Chloride" and "Xylidine" the Guide recommended "full protective clothing."
 
 
 [5]
 Paul Sund was unavailable as a witness, apparently because of the accident. See note 6, infra
 
 
 [6]
 The record is incomplete regarding the extent of Sund's injuries. It was suggested in hearsay testimony by Mr. Goyda, objected to and apparently excluded by the ALJ, that Sund was "comatose." Counsel for the Secretary, meanwhile, represented to the ALJ that "(Mr. Sund) is simply not available. We made those attempts and were not successful. Indeed, I doubt if anyone ever will be successful in reaching Mr. Sund again." In any event, it was uncontested that Sund was hospitalized as a result of the accident, and Astra considered the event serious enough to warrant contacting OSHA
 
 
 [7]
 Inspector Goyda stated that he had seen a respirator while at the Astra plant, that this respirator was not a "self-contained mask," see note 4, supra, but that it did cover the "nose and mouth."
 
 
 [8]
 Both of these statements, as testified to by Mr. Goyda, were admissions made by Astra's "agent" and "servant" concerning "a matter within the scope of (their) agency or employment" and hence were not hearsay. Fed.R.Evid. 801(d)(2)(D). See Pillsbury Co. v. Cleaver-Brooks Div. of Aqua-Chem, Inc., 646 F.2d 1216, 1217-18 (8th Cir. 1981); Saltzburg & Redden, Federal Rules of Evidence Manual 460-61 (2d ed. 1977)
 
 
 [9]
 In so saying we do not mean to condone the Secretary's exceptionally careless investigation and incomplete presentation. While we now uphold the Commission, the evidence in support of its decision is obviously at the outer limits of sufficiency
 
 
 [10]
 Astra contends that Mandella's statement supports only inferences regarding protective "equipment" and not "clothing" since he was asked specifically only about "equipment." However, Mandella himself listed "gloves" in answer to the question regarding "equipment." In view of this, and all the other facts and circumstances in the record, we cannot say the Commission acted unreasonably in interpreting Mandella's answer as generally covering both the equipment and clothing categories
 
 
 [11]
 29 U.S.C. § 661(i) requires that the Commission take into account such factors as the size of the company, the gravity of the violation, the good faith of the employer, and the history of prior violations in assessing a penalty. Astra alleges and the Secretary does not dispute that the Commission's inquiry into these matters was inadequate