**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2893
_____

SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,

Petitioner

v.

CONOCOPHILLIPS BAYWAY REFINERY,

Respondent

_____

On Appeal from the Occupational Safety and Health Review
Commission
(OSHRC Docket No. 07-1045)

_____

Argued
July 12, 2011
_____

1

Before: SLOVITER, FUENTES and GARTH, Circuit Judges.
(Opinion Filed: August 16, 2011)

Gary K. Stearman (Argued)
U.S. Department of Labor
200 Constitution Ave., N.W.
Washington, D.C. 20210
        Counsel for Petitioner

Dennis J. Morikawa (Argued)
Morgan, Lewis & Bockius LLP
1701 Market St.
Phila, PA 19103
        Counsel for Respondent

_____

OPINION OF THE COURT
_____

GARTH, *Circuit Judge*:

In this appeal, although ConocoPhillips Bayway Refinery is the real party in interest, we are asked to decide between different interpretations of agency regulations—the one announced by the Secretary of Labor, the other by the Occupational Safety and Health Review Commission. Both entities are part and parcel of the Department of Labor. In this appeal, because two factions within the same government agency disagree with each other over the application of a standard, we are thrust into resolving what is essentially an

2

internal dispute. We do so here, and hold that the Secretary's interpretation comports with the standard we established in *Secretary of Labor v. Trinity Industries*, 504 F.3d 397 (3d Cir. 2007).[1]

## I.

The Secretary of Labor ("Secretary") petitioned this Court to challenge the determination of the Occupational Safety and Health Review Commission ("Commission") that nine asbestos violations by ConocoPhillips Bayway Refinery ("Conoco") were "not serious" rather than "serious" under 29 U.S.C. § 666. The Secretary originally cited Conoco for nine "serious" violations of the asbestos in construction standard, 29 C.F.R. § 1926.1100, under the Occupational Safety and Health Act ("Act"), 29 U.S.C. §§ 651-678. The Administrative Law Judge ("ALJ") affirmed all of the violations and upheld the classification of the violations as "serious." The Commission thereafter reduced the classification of the nine violations to "other-than-serious," in part because the Secretary failed to present case-specific evidence of possible employee exposure to asbestos.

---

[1] "[The Occupational Safety and Health Administration] separates enforcement and rulemaking powers from adjudicatory functions. The Secretary is charged with the responsibility for setting and enforcing workplace safety standards. [She] is empowered to issue authoritative interpretations of the statute and 'has the sole authority to determine whether to prosecute a violation of the Act.'" *Reich v. Occupational Safety and Health Review Comm'n*, 998 F.2d 134, 137 (3d Cir. 1993) (*citing Cuyahoga Valley Ry. Co. v. United Transp. Union,* 474 U.S. 3, 5 (1985)). "The Commission, on the other hand, is assigned to carry out adjudicatory duties . . . In performing its tasks, the Commission reviews the Secretary's interpretation only for reasonableness and consistency with statutory and regulatory language." *Id.* "Stated simplistically, the Secretary is entrusted with the enforcement and interpretation of law and the Commission with making findings of fact." *Id.*

We conclude that the Commission misapplied this Court's precedent in *Secretary of Labor v. Trinity Industries*, 504 F.3d 397 (3d Cir. 2007). We will therefore vacate the Order of the Commission, and remand to the Commission with the direction that the citations be affirmed as "serious" and that the penalty for the violations be reconsidered.

## II.

### A.

Pursuant to the Act, the Secretary shall promulgate occupational safety and health standards. 29 U.S.C. § 655.[2] The Occupational Safety and Health Administration ("OSHA"), an agency within the Department of Labor, helps the Secretary promulgate these standards. OSHA regulates asbestos exposure at 29 C.F.R. §§ 1926.1101 (construction standard) and 1910.1001 (industry standard), and has determined that asbestos is a harmful substance. *E.g.* Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite, 51 Fed. Reg. 22,647-48, 22,698 (June 20, 1986) (to be codified at 29 C.F.R. pt. 1910); Occupational Exposure to Asbestos, 59 Fed. Reg. 40,967, 40,979 (Aug. 10, 1994) (to be codified at 29 C.F.R. pt. 1910).

### B.

---

[2] Because the various asbestos terms which we employ throughout this opinion are known by their acronyms, we furnish this glossary:
ACM = Asbestos Containing Material
PACM = Presumed Asbestos Containing Material
TSI = Thermal System Insulation
PEL = Permissible Exposure Limit
f/cc = fiber per cubic centimeter of air

4

The construction standard ("Standard"), the regulation at issue in this case, prescribes certain protective requirements based on the measurable concentration of asbestos fibers to which employees are or may be exposed, and contains a second set of specific requirements that apply regardless of the level of exposure.

The Standard sets a permissible exposure limit (PEL) of 0.1 fiber per cubic centimeter of air (f/cc), and imposes certain assessment and monitoring requirements to ensure that no employee is exposed to an airborne concentration of asbestos in excess of this limit.[3]  29 C.F.R. § 1926.1101(c). This PEL represents the lowest exposure level that can be reliably measured.  59 Fed. Reg. 40,967.  The Standard recognizes a significant risk even under a PEL of 0.1, and in order to reduce that risk to the extent practicable, the Standard has taken an approach of adding certain protective provisions based on the kind of operations being regulated.  59 Fed. Reg. 40,968.  *See also id.* 40,967 (acknowledging that the 0.1 f/cc level "leaves a remaining significant risk").  Additionally, measured levels of exposure "often fail to define risk," and with regard to removal work (the type of work at issue in this case), "highly variable amounts of asbestos are generated." *Id.* 40,968.  Therefore, the Standard requires such employees to be protected in order to assure each asbestos worker is exposed to the lowest feasible level.  *Id.*  The mandated work practices are important because they "assure that each asbestos worker is exposed to the lowest feasible level." *Id.* 40,969.  "The operations for which mandatory work practices

---

[3]  Of note, the PEL is not equivalent to the percentage of asbestos that a particular material contains.  For example, a mastic may be 20% asbestos, but the PEL may be under 0.1.

are required would otherwise result in employee exposure that is significant." *Id.*

The Standard classifies asbestos work activities into four classes, of which only Class I and Class II are relevant in this appeal.

Class I asbestos work refers to activities involving the removal of TSI (thermal system insulation), surfacing ACM (asbestos containing material) and PACM (presumed asbestos containing material). 29 C.F.R. § 1926.1101(b).

Class II asbestos work consists of the removal of ACM which is neither TSI nor surfacing material—for example, asbestos-containing wallboard, floor tile and sheeting and construction mastics. *Id.*

The work at issue in this case falls into Class II. Protective requirements for Class II work include: the establishment of a regulated area (§ 1926.1101(e)(1)); the use of respirators (§ 1926.1101(h)); in the absence of a negative exposure assessment, the use of protective clothing (§ 1926.1101(i)(1)); and training of employees (§ 1926.1101(k)(9)(iv)(C)).

All employers with workplaces covered by the Standard must conduct an initial exposure assessment before or at the beginning of an operation to ascertain expected exposures of asbestos. 29 C.F.R. § 1926(f)(2). For Class I asbestos work, "until the employer conducts exposure monitoring and documents that employees on that job will not be exposed in excess of the PELs," the employer shall

6

presume that employees are exposed in excess of the limit. *Id.* § 1926(f)(2)(ii).

Violations of OSHA standards are characterized as "willful," "repeated," "serious," or "not serious" (referred to by the Commission as "other-than-serious"). *See* 29 U.S.C. § 666. A violation is "serious" if:

> [T]here is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

*Id.* § 666(k). "Serious" and "not serious" violations are both subject to civil penalties of up to $7,000. A penalty is mandatory for "serious" violations. *Id.* § 666(b),(c).

## C.

Conoco operates a refinery in Linden, New Jersey. In September 2006, Conoco determined that an underground pipeline installed in the early 1950s was leaking gasoline and needed to be partially replaced. The gas line, 14" in diameter, was housed inside a 20" protective pipe ("the sleeve"), which was coated with a tar-like substance ("the mastic"). Conoco did not initially test the mastic to determine whether it contained asbestos. Conoco also failed to perform an initial exposure assessment before removing a portion of the sleeve

7

and cutting into the mastic. Three Conoco mechanics worked with the pipe without taking all of the precautions mandated by § 1926.1101. One Conoco mechanic used a hammer and chisel for about thirty minutes to chip an approximately 5" band of mastic from around the circumference of the sleeve. A second mechanic then cut through the sleeve where the mastic had been removed with a torch for another thirty minutes. A third Conoco mechanic held the sleeve in a sling while it was torched. These activities were performed without using wet methods to control exposures and without establishing a regulated area. The mechanics did not use or wear specialized equipment or clothing.

On September 18, 2006, Conoco began an investigation into potential employee exposures resulting from the work performed on the underground pipe. Conoco established an investigation team consisting of two union representatives and two Conoco management employees. The team decided to conduct a mock test on an intact portion of the pipe sleeve to determine whether exposure to airborne asbestos fibers could have occurred. The test attempted to replicate the work that the employees working on the sleeve had conducted. The investigation report stated that the mock testing results showed no detectible levels of airborne asbestos in the breathing zone samples. (J.A. 218-23.) The Secretary disputed the validity of this testing before the ALJ, but the ALJ determined that the mock testing was not invalid. (J.A. 33-34.) However, the ALJ also determined that there "is no reason to conclude that no asbestos was released during the cited work and that there was no exposure to asbestos fibers." (J.A. 35.) Rather, the ALJ found it "more likely than not that asbestos fibers were released during the cited work and that exposure to asbestos occurred." (Id.) The ALJ did

8

determine, based in part on the testing and the low levels of fibers detected, that the likelihood of injury was low. (Id.)

After OSHA conducted an inspection of the refinery, the Secretary, on March 8, 2007, cited Conoco for the following violations:

- Failing to determine the presence, location and quantity of ACM and to notify employees of this information prior to beginning work, pursuant to § 1926.1101(k)(2)(i) and (ii).
- Failing to conduct an initial exposure assessment before cutting into the mastic, pursuant to § 1926.1101(f)(2)(i).
- Failing to use engineering controls and work practices in the form of wet methods, pursuant to § 1926.1101(g)(1)(ii).
- Failing to establish a regulated area, pursuant to § 1926.1101(e)(1).
- Failing to provide the proper respiratory protection equipment, pursuant to § 1926.1101(h)(3)(iii)(A).
- Failing to require the use of protective clothing, pursuant to § 1926.1101(i)(1).
- Failing to use warning signs, pursuant to § 1926.1101(k)(7)(i).
- Failing to train employees, pursuant to § 1926.1101(k)(9)(iv)(A).
- Improperly disposing of waste material, pursuant to § 1926.1101(l)(2).

(J.A.[4] 246-54.)

---

[4] J.A. refers to Joint Appendix.

9

The Secretary classified all the violations as "serious" and proposed a penalty of $2,500 for each.

D.

The ALJ affirmed all of the violations, and upheld the classification of the violations as "serious." She found that the work involved was Class II work, and further found that the Secretary met her burden of proving that the 20" protective pipe sleeve and surrounding mastic contained more than 1% asbestos, and found that Conoco's own testing established the presence of asbestos levels far higher than 1%, for example at 20% and 25%. (J.A. 20-21, 23.)

The ALJ additionally found that Conoco had "constructive knowledge" of the violative conditions, and made the following factual findings: (1) the refinery's Management Procedure recognized that many areas in the refinery contain asbestos, and devotes 17 pages to asbestos hazards; (2) Conoco was aware that underground pipes often contain asbestos, and the refinery's 2005 and 2006 fact sheets stated that asbestos could still be found in the refinery; (3) Conoco Bayway's asbestos training stated that asbestos was widely used between 1940 and 1975; and (4) "the subject sleeve was known to have been installed in the 1950's." (J.A. 27-28.) She noted additionally that the preamble to the asbestos standard indicates that asbestos is used as a filler for tar-based surface coatings, which are used as protective coatings for underground pipelines. (J.A. 28, *citing* 59 Fed. Reg. 40,964, 41,028.)

10

Finally, the ALJ reduced the proposed penalty to $1,875 for each violation, in part because Conoco's mock testing revealed a low likelihood of injury. (J.A. 32-35.)

E.

On review, the Commission reduced the classification of the violations to "other-than-serious," and the total penalty from $16,875 to $3,150. (J.A. 4.)

The Commission noted that it was "undisputed that the tar-like coating around the pipe's sleeve contained between 2 and 25 percent asbestos," but asserted that the Secretary "must show that the work performed on the particular material involved in this case . . . could have generated, and exposed Conoco employees to, a harmful amount of asbestos." (J.A. 4-5.) The Commission faulted the Secretary for failing to present any case-specific evidence, and for relying solely "on how the asbestos in construction standard and its regulatory history address Class II work." (J.A. 5.) The Commission concluded that there was a possibility in this case that the work performed did not have the potential to generate and expose Conoco employees to a harmful amount of asbestos, and that therefore the Secretary had not established that Conoco's violations were "serious." (J.A. 6.)

The Secretary timely petitioned this Court for review.[5]

## III.

Pursuant to the Administrative Procedure Act ("APA"), this Court may set aside the legal conclusions of an

---

[5] The Commission had jurisdiction over the enforcement proceeding pursuant to 29 U.S.C. § 659(c). This Court has jurisdiction pursuant to 29 U.S.C. § 660(b).

11

agency body if they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2); *Trinity*, 504 F.3d at 400. The Court "must defer to an agency's reasonable interpretation of an ambiguous statute." *Trinity*, 504 F.3d at 400 (citing *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 856 (3d Cir. 1996)) (internal quotation marks omitted). Issues of pure law, such as whether the agency properly applied a legal standard set out by this Court, receive plenary review. *See Broome v. U.S. Dept. of Labor*, 870 F.2d 95, 99 (3d Cir. 1989).

"In those instances in which the Secretary of Labor's interpretation differs from the interpretation of the [Commission], the Court must defer to the Secretary's reasonable interpretation." *Trinity*, 504 F.3d at 400. "[T]he Secretary is entrusted with the enforcement and interpretation of law." *Reich*, 998 F.2d at 137.

## IV.

The Secretary argues that under the *Trinity* standard, the violations in this case are "serious." She maintains that she was not required to proffer case-specific evidence to demonstrate the seriousness of the violations here, as the Commission held, largely because the regulations support a presumption that Class II work exposes employees to significant amounts of asbestos.

## A.

Although *Trinity* involved Class I work, it guides our analysis here. In *Trinity*, the company had work done on a furnace that required removing material classified as PACM.

Trinity believed that any asbestos present had been removed and that new insulation would be asbestos-free, and thus did not conduct tests to determine if asbestos was present. The ALJ upheld two violations under § 1926.1101(k), but reclassified the violations as "not serious." 504 F.3d at 400.

The Secretary claimed on appeal that this was error and that the violations should have been classified "serious." 504 F.3d at 399-400. We affirmed the Secretary's classification. *Id.* at 401.

In *Trinity*, we set a standard that we apply to determine whether many asbestos violations are "serious." *See* 504 F.3d at 401. Initially, we explained that "[i]t is well-settled that, pursuant to § 666(k) 'when the violation of a regulation makes the occurrence of an accident with a substantial probability of death or serious physical harm *possible*, the employer has committed a serious violation of the regulation.'" *Id.* (citing *Bethlehem Steel Corp. v. OSHRC*, 607 F.2d 1069, 1073 (3d Cir. 1979) (emphasis in original)). We held that the ultimate question was whether, "as a result of the failure to test and notify, it was *possible* that an accident *could* occur in which it was substantially probable that death or serious physical harm would result." *Id.* (emphases added). As such, demonstrating actual exposure to asbestos was unnecessary. *Id.; see also Walmart Stores, Inc. v. Sec'y of Labor*, 406 F.3d 731, 736 (D.C. Cir. 2005) (holding that actual conditions at work site are beside the point because the issue was whether employees could have been seriously injured).

Conoco and the Commission attempt to distinguish *Trinity* by focusing on *Trinity*'s statement that where asbestos

13

is "presumed to be present," a failure to test is "unquestionably serious." *Id. Potential for exposure*, which is the focus under the standard, is not dependent upon whether the material is ACM or PACM—both can and do lead to exposures above the PEL or to exposures below the PEL that are still harmful.

The Commission distinguished *Trinity* based on the differences between Class I work, at issue in *Trinity*, and Class II work, at issue in this case. (J.A. 6.) Yet, *Trinity* placed no emphasis on the type of work involved. Further, while Class I work is sometimes presumed to result in a concentration over the limit—i.e., definite exposure to asbestos—Class II work can still lead to asbestos exposure even if the concentration is under the permissible limit. *See* 59 Fed. Reg. 40,968-69, 40,978, 40,982. Thus the Commission acted contrary to *Trinity* and thus to our declared standard in relying on a distinction between Class I and Class II work.

*Trinity*'s standard only requires that there *could be* exposure to asbestos that is substantially probable to lead to serious harm. Applying this standard, Conoco's violations were "serious."

## B.

The Commission held, and Conoco argues, that the Secretary must put forth case-specific evidence showing that the employees could have been exposed to harmful asbestos and thus that the violations were serious. The Commission's determination is contrary both to the standard in *Trinity* and

14

to the asbestos construction standard, and therefore constitutes an abuse of discretion.

The Commission held that to demonstrate that the violations in this case were serious, "the Secretary must show that the work performed on the particular material involved in this case . . . could have generated and exposed Conoco employees to a harmful amount of asbestos." (J.A. 5.) This holding ignores the Standard's presumption that violations of Class II asbestos requirements expose employees to substantial amounts of asbestos. *See* 59 Fed. Reg. 40,968-69. The violations in this case largely involved requirements for work practices and engineering controls that are applicable to Class II asbestos work without regard to whether exposures exceed the PEL. Under the regulations, the Standard indicates that Class II work generates "significant" employee exposure to asbestos. *See id.* (noting that the "operations for which mandatory work practices are required would otherwise result in employee exposure that is significant" and that concentrations below the 0.1 f/cc are harmful;); s*ee also* 59 Fed. Reg. 40,978, 40,982 (observing that reducing exposure to 0.1 f/cc does not eliminate significant risk since "a still significant risk remains below the PEL").

The Commission reasoned that the regulations did not establish *how far* below the PEL a risk extends, and that Class II work is not presumed to generate any particular PEL. (J.A. 6.) The Commission thus concluded that there is a "possibility" that the work in this case "may not have had the potential to . . . expose" employees to a harmful amount of asbestos, and that therefore the Secretary had not met her burden. (Id.)

15

Thus, the Commission, by its own holding, admits that there is a possibility that the work *may have* actually exposed employees to a harmful level of asbestos, which is all that this Court's standard requires. The Commission misapplied the *Trinity* standard in seemingly requiring the Secretary to negate the possibility that employees may not have been exposed to harmful asbestos. Rather, the Secretary must simply demonstrate the possibility of such exposure.

We therefore conclude that demonstrating the possibility of harmful exposure to asbestos does not require case-specific evidence under this Court's standard, where the Secretary demonstrates that (1) employees engaged in a particular type of asbestos work, (2) the work at issue is presumed to generate significant employee exposure to asbestos under the regulations, (3) the employer had actual or constructive knowledge of the violative conditions, and (4) regulations were violated.

C.

Finally, we address Conoco's argument that under the Secretary's proposed standard, almost any violation of a regulation where harmful asbestos is present would be a "serious" violation. We acknowledge that under the *Trinity* standard, in combination with the asbestos construction Standard and its accompanying regulations, many violations of asbestos regulations relating to Class II asbestos will be *presumptively* "serious." But no bright-line rule has been established.

First, it is not the case that the Secretary demonstrates a violation of any asbestos regulation and *ipso facto* the

16

violation is classified as "serious." Class II asbestos work is limited to removal of materials that contain more than 1% asbestos. The Secretary pointed to regulations which established a presumption that Class II work generates significant employee exposure. This presumption, which may not exist for all classes of work, aided the Secretary in meeting her burden of showing that exposure to harmful asbestos was possible. In a different case, the Secretary will again be required to show that such a presumption exists, or demonstrate in some other way that exposure could occur.

Second, the Secretary indicates that certain violations, such as deviations from requirements relating to recordkeeping and housekeeping, may not be classified as "serious."

Third, the Secretary must always show that the employer had actual or constructive knowledge of the violative conditions. *See Sec'y of Labor v. Astra Pharm. Prods., Inc.*, 9 BNA OSHC 2126, \*4 (Jul. 30. 1981) (*aff'd in part and remanded in part*, *Astra Pharm. Prods., Inc. v. OSHA*, 681 F.2d 69 (1st Cir. 1982)) ("In order to prove a violation of section 5(a)(2) of the [Occupational Safety and Health] Act, 29 U.S.C. § 654(a)(2), the Secretary must show by a preponderance of the evidence that (1) the cited standard applies, (2) there was a failure to comply with the cited standard, (3) employees had access to the violative condition, and (4) the cited employer either *knew or could have known* of the condition with the exercise of reasonable diligence.") (emphasis added).

Such requirements place limits on the types of work and on the employers that can be held accountable for an

asbestos violation. In this case, the ALJ found that Conoco had "constructive knowledge" of the violative conditions—that the sleeve coating contained asbestos—and made findings based on evidence which demonstrated Conoco's constructive knowledge. (J.A. 27-28.)

Fourth, although we hold that the Secretary is not required to proffer case-specific evidence of potential exposure to satisfy this Court's standard, we point out that the employer is always permitted to rebut by evidence which demonstrates that there was <u>no possibility</u> of exposure. For example, an employer could show that the asbestos in this case was protected in a way that it could never have been released, and thus there was zero chance of exposure. Such evidence could serve the purpose of rebutting the presumption in the regulations. Essentially, where the Secretary has shown violations of regulations involving Class II work and the presence of asbestos, it will shift the burden to the employer to show that the violations were not "serious."

V.

We conclude that under *Trinity*, the violations in this case were "serious," and that the Secretary is not required to proffer case-specific evidence to meet *Trinity*'s standard. We therefore vacate the Order of the Commission, and remand to the Commission with the direction that it affirm the citations as "serious" and reconsider the penalty for the violations in light of this opinion.